# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

|  |  |  |
|---|---|---|
| JULIE STOCKDALL, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.: 4:15-cv-00189-JAJ-CFB |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, Commissioner of Social Security, | ) | **REPORT AND RECOMMENDATION AND ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Julie Stockdall seeks review of Defendant Social Security Commissioner's decision denying her application for supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383(f). This Court reviews the Commissioner's final decision. 42 U.S.C. § 405(g). On January 21, 2016, this case was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). ECF No. 11.

## I. PROCEDURAL BACKGROUND

Stockdall filed an application for SSI on June 17, 2013, initially alleging her inability to work began on January 1, 1992. Tr. at 176. During the administrative hearing, the onset of disability was changed to the date of filing, June 17, 2013. Tr. at 37. The Social Security Administration (SSA) denied Stockdall's application initially and on reconsideration. Tr. at 85, 102. An administrative hearing on Stockdall's claim followed on February 5, 2015. The Administrative Law Judge (ALJ), Jo Ann L. Draper, issued an unfavorable decision on February 11, 2015. Tr. at 16-27. The Appeals Council denied Stockdall's request for review of the ALJ's decision on April 21, 2015, making the ALJ's decision the SSA's final agency action. Stockdall

1

filed this appeal for judicial review on June 22, 2015. ECF No. 1. Plaintiff's Brief was filed on

November 2, 2015. ECF No. 8. The Commissioner filed a Responsive Brief on December 22,

2015. ECF No. 9. Stockdall did not file a Reply. The Court deemed this matter ready for

submission on January 19, 2016. ECF No. 6.

## II. FACTUAL BACKGROUND

Stockdall was forty-four years old at the time of her administrative hearing in 2015. Tr. at

37. She dropped out of high school and got a GED in 1988. Tr. at 37, 264. She completed some

college coursework and then quit. Tr. 38, 264. The record reflects a sporadic, mostly part-time,

work history beginning in 1999 when she earned a total of $2,105.13 working for six different

employers. Tr. 188-92. Stockdall worked part-time for Hy-Vee, Inc., in 2007 and 2008, around

which time she was diagnosed with breast cancer and began treatment. Tr. at 39, 191, 264, 304.

She has not worked since that time.

Although Stockdall provided a SSA field office interviewer fourteen physical and mental

medical conditions which she believes limit her ability to work (Tr. at 201), her medically-

determinable, severe impairments relevant to this case are: depression, anxiety with post-

traumatic stress disorder features, borderline intellectual functioning, and personality disorder.

Tr. at 18; Pl.'s Brief at 3.

### A. Medical Records Relevant to Stockdall's Mental Impairments

### 1.  State Agency Assessments

On April 27, 2010, the Iowa Disability Determination Services Bureau (DDS) referred

Stockdall to Dr. Richard A. Martin for a psychological evaluation.[1] Tr. at 264. He assessed

---

[1] Dr. Martin's 2010 psychological evaluation was in relation to a previous application for disability benefits. Tr. at 24. According to DDS records, Stockdall made prior claims for disability benefits that were denied on December 27, 2006, July 27, 2010, and February 9, 2011. Tr. at 98.

Stockdall based on a Mental Status Examination (MSE), Wechsler Adult Intelligence Scale (WAIS-IV), and an Adaptive Functioning Interview. Tr. at 264. Dr. Martin was not unfamiliar with Stockdall, as he previously evaluated her in 2006 and 2008 on behalf of DDS. *Id.* During the 2010 visit Dr. Martin reported that Plaintiff "immediately commented on her intent to keep pressing for a favorable disability claim." Tr. at 264.

As a result of the WAIS-IV, Stockdall received a Full Scale IQ score of 81,[2] causing Dr. Martin to conclude that Stockdall was in the low-average range of intellectual functioning. Tr. at 266. Based on Stockdall's performance on the MSE, Dr. Martin found that Stockdall met the criteria for a primary diagnosis of recurrent major depressive disorder, further noting that Stockdall's symptoms were mild in intensity. Tr. at 268. In addition to diagnoses of major depressive order and polysubstance abuse,  Dr. Martin diagnosed Stockdall with malingering, citing the comment she made about pressing for a disability claim, as well as his suspicion that she exaggerates her symptoms. *Id.*

On November 6, 2013, a disability determination of "not disabled" was made at the initial review level. Tr. at 72-86. Russell Lark, Ph.D., reviewed Stockdall's medical evidence on behalf of DDS as part of a mental RFC assessment for this initial review. Tr. at 82-84. Lark found that Stockdall was "moderately limited" in her "ability to maintain attention and concentration for extended periods;" "no evidence of limitation" in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" "moderately limited" in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without

---

[2] "The [WAIS-IV] Full Scale IQ is derived from a combination of the subtest scores and is considered the most representative estimate of global intellectual functioning." Tr. at 362. Further, "[p]ossible scores on the WAIS-IV range from 40 to 160 with a mean of 100 and a standard deviation of 15." *Id.*

an unreasonable number and length of rest periods;" "moderately limited" in her "ability to interact appropriately with the general public;" and in her "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." Tr. at 82-83. Lark referenced the assessment completed by Dr. Martin on behalf of DDS in April 2010, specifically noting Stockdall's WAIS-IV scores, including her Full Scale IQ score of 81, and the mention of possible malingering. Tr. at 84. Next, Lark paraphrased portions of Stockdall's treatment record with Capstone Behavioral Healthcare (Capstone), between November of 2011 and September of 2013. In conclusion, Lark found that Stockdall had "several mental MDIs that do not meet/equal listing level," and her "statements regarding her functional limitations related to her mental MDIs are mostly credible." Lark further found:

> [Stockdall's] memory, attention, concentration, and pace may vary but are adequate for tasks not requiring sustained attention. The preponderance of evidence in file indicates that claimant is able to complete simple, repetitive tasks on a sustained basis in a low stress environment that requires limited interaction with others.

Tr. at 84.

On March 13, 2014, a disability determination of "not disabled" was made at the reconsideration level. Tr. at 88-103. Myrna Tashner, Ed.D., reviewed Stockdall's medical evidence on behalf of DDS as part of a mental RFC assessment for the review on reconsideration. Tr. at 98-101. Tashner's findings were identical to Lark's 2013 findings, and Tashner's five paragraph explanation is identical to the first four paragraphs of Lark's explanation, with one exception—a final paragraph labeled "RECONSIDERATION," which states:

> Claimant has not sought any further treatment both mental or physically. Third party ADL's[3] now also indicate numerous limitations has [sic] previously discussed. Credibility of third party ADL's is at least partially not credible when compared to evidence in file. Current review is affirmed.

---

[3] ADL is an acronym for "activities of daily living." *See Tucker v. Colvin*, 117 F. Supp. 3d 594, 601.

Tr. at 101.

Stockdall visited the Poweshiek County Mental Health Center in September of 2010, at the request of DDS, where she saw a psychology associate, Ron Stinson, and a licensed psychologist, Megan Hasenwinkel. Tr. at 275-77. She was diagnosed with anxiety disorder, major depressive disorder, cluster B traits, and chronic pain. She declined psychotherapy treatments to address her anxiety and depression at that time, opting instead to better manage her medication. Tr. at 276.

In summary, there are four medical records that were created at the request of the SSA, consisting of fifteen pages. The first two records, both created in 2010, are assessments and evaluations by examiners. The last two records, created in November of 2013 and March of 2014, are mental RFC assessments created by non-examining reviewers of Stockdall's file, as part of the decision on Stockdall's disability claim at the initial and reconsideration levels of review.

**2. Other Assessments**

Stockdall turned to Capstone for further treatment relating to her mental impairments. There are psychiatric treatment notes in the record beginning in November of 2012 and ending in December of 2014. During this two-year span Stockdall saw a psychiatrist, Dr. Laura Van Cleve, nine times.[4] She also saw Amanda Johnson, a licensed psychologist, twice for a psychological evaluation in June and July of 2014, and twice for counseling in June and November of 2014.

---

[4] Notes from an office visit with her family practice physician, Dr. Ruggle, reveal that Stockdall treated with Dr. Van Cleve at her psychiatry office in Grinnell, Iowa, prior to October 2012, and then Stockdall followed Dr. Van Cleve to Capstone in Newton, Iowa. Tr. at 281.

Additionally, she saw a second licensed psychologist, Michelle Cushman, for a psychological evaluation completed on August 18, 2014.

Insight into Stockdall's relationship with Dr. Van Cleve began on November 17, 2011, with a note to the chart regarding correspondence received from Dr. Ruggle, Stockdall's family practice physician, suggesting starting Stockdall on ADHD medicine. Tr. at 329. Most of Dr. Van Cleve's nine progress notes over a thirteen month timeframe indicate she followed Stockdall for anxiety disorder, cluster B personality traits, and ADHD. Tr. at 320, 323, 327, 356, 373, 375, 378. However, the next-to-last note was entered after Stockdall's psychological evaluations at Capstone, and reflected the August 18, 2014, diagnoses of PTSD, major depressive disorder, and borderline intellectual functioning. Tr. at 360. The last two notes specifically indicated that Dr. Van Cleve saw Stockdall to discuss her symptoms and for medication management. Tr. at 356, 360.

Stockdall was prescribed the following medications for the medical conditions at issue in this case: Effexor, a/k/a Venlaflaxine, to treat her anxiety and depression; and Concerta, then later Vyvanse, to treat her ADHD. Tr. at 57-58, 320, 323, 325, 327, 356, 360, 373, 375, 378. Throughout nine visits between November 2012 to December 2014, Dr. Van Cleve met with Stockdall, discussed her symptoms, and managed her medications. *Id.* On November 29, 2012, Dr. Van Cleve increased the Venlaflaxine prescription from 75 to 150 milligrams, which Stockdall reported helped her think clearly and be less angry and irritable. Tr. at 325, 327. However, she could not tolerate a second increase of this medication that was prescribed on July 1, 2013, she reported on September 30, 2013 that taking more of this medication made her feel excessively tired. Tr. at 320. On December 16, 2013, Dr. Van Cleve increased the Concerta prescription from 36 to 54 milligrams, and at her next appointment on May 12, 2014, Stockdall

reported that it was not working. Tr. at 375, 378. Dr. Van Cleve switched Stockdall to Vyvanse on May 12, 2014, and Stockdall reported it was quite helpful during her June 23, 2014 visit. Tr. at 373, 376. The Vyvanse prescription was increased by 10 milligrams, and Stockdall tolerated the increase well. Tr. at 360. On several occasions at her appointments in December 2013, May 2014, and December 2014, Dr. Van Cleve urged and encouraged Stockdall to consider therapy. Tr. at 361, 376, 379.

Dr. Van Cleve referred Stockdall to Dr. Amanda Johnson, a licensed psychologist at Capstone, for diagnostic clarification. Tr. at 367. Stockdall underwent this psychological evaluation on June 30, 2014, and July 1, 2014, at which point Dr. Johnson assessed Stockdall using a clinical interview, the Minnesota Multiphasic Personality Inventory-II (MMPI-2), and the Million Clinical Multiaxial Inventory-III (MCMI-3). Dr. Johnson felt that results from the MMPI-2 were questionable because Stockdall may have been exaggerating or over-reporting symptoms. Tr. at 368. However, Dr. Johnson clarified Stockdall's responses during her clinical interview, and found it "apparent that Julie is in high distress." *Id*. She further found that Stockdall "somaticizes"[5] when in an emotionally chaotic state, and that she was experiencing severe anxiety and depression. *Id.* The results of the MCMI-3 were similar. *Id*. Based on these assessment procedures, Dr. Johnson diagnosed Stockdall with: 1) Major Depressive Disorder Recurrent Severe; and 2) Generalized Anxiety Disorder vs. Post-Traumatic Stress Disorder. She ruled out: 3) Avoidant Personality Disorder; and 4) Intellectual Difficulties/Learning Disorder(s). Tr. at 370. Dr. Johnson recommended that Stockdall undergo further therapy sessions, consult with a medical provider, maintain a healthy lifestyle to improve depression symptoms and focus, and consult with medical providers concerning report results to determine if changes in her

---

[5] To somaticize means to convert psychological stress into physical symptoms. *Fifield v. HM Life Ins. Co.*, 900 F. Supp. 2d 110, 114 (discussing a doctor's evaluation).

treatment plan were necessary. *Id.* Dr. Van Cleve's note from Stockdall's October 6, 2014, appointment indicates that she reviewed this evaluation.

In addition to the psychological evaluation, Dr. Johnson counseled Stockdall at least twice—once on June 30, 2014, and once on November 3, 2014. Tr. at 358-59, 371-72.[6] At the June 30, 2014, appointment, Dr. Johnson noted that Stockdall's "[s]ymptoms have not changed," and found her "somewhat anxious and . . . somewhat tangential in her speech." Tr. at 371. Dr. Johnson also noted that Stockdall was wearing a wrist brace. *Id.* Stockdall reported "that she recently got mad at a friend for 'joking about cheating with her boyfriend' and punched a wall." *Id.* Dr. Johnson and Stockdall planned that Stockdall would return to Capstone for psychological testing the following month. *Id.* Dr. Johnson met with Stockdall again in November of 2014, following Stockdall's psychological testing. Dr. Johnson noted that Stockdall's "[s]ymptoms have worsened," and found Stockdall "was experiencing low mood and affect from depressed to irritable." Tr. at 358. Dr. Johnson and Stockdall planned that "[t]herapy will continue because [Stockdall] is in distress and has difficulty dealing with the symptoms of her mental health issues." *Id.* Dr. Johnson noted that she would see Stockdall again in January of 2015 due to Dr. Johnson's limited availability. Tr. at 358.

Stockdall underwent another psychological evaluation with a different licensed psychologist at Capstone, Dr. Michelle Cushman, on August 18, 2014. Stockdall was referred to Dr. Cushman "to assist with differential diagnosis and to provide information for seeking disability benefits." Tr. at 362. Dr. Cushman assessed Stockdall using the WAIS-IV, the Beck Depression Inventory-II (BDI-II), and the PTSD Checklist – Civilian Version (PCL-C). As a result of the WAIS-IV, Dr. Cushman concluded that Stockdall's "overall intellectual functioning

---

[6] However, it is clear from the record that this treatment relationship dates back several years, as Dr. Johnson referenced "ADHD testing together 2 years ago." Tr. at 371.

falls in the Extremely Low range" with a Full Scale IQ score of 68. Tr. at 363, 365. However,

Dr. Cushman believed the variability amongst index scores to be indicative of learning disorders

and concluded that additional assessment could determine if Stockdall meets the criteria for

intellectual disability. *Id*. Dr. Cushman further noted that Stockdall's mental health concerns may

have interfered with the testing because she would have expected an overall higher IQ score,

citing an example of how Stockdall did not give herself credit for recognizing numbers, yet she

could produce symbols paired with said numbers. *Id*. Stockdall's score was 39 on the BDI-II.[7]

Based on this score, Dr. Cushman concluded that Stockdall was experiencing significant

symptoms of depression. Tr. at 364. Stockdall scored a 78 on the PCL-C.[8] Based on this score,

Dr. Cushman concluded that Stockdall was likely struggling with significant symptoms of PTSD.

Tr. at 364. Based on Dr. Cushman's behavioral observations of Stockdall, she believed the

results were valid. Tr. at 362. Dr. Van Cleve referenced Dr. Cushman's evaluation in her October

6, 2014 note, stating that "[Stockdall] had a psychological evaluation on 08/18/14, with

diagnoses of PTSD, Major Depressive Disorder, and borderline intellectual functioning." Tr. at

360.

On January 29, 2015, Dr. Van Cleve completed a "Mental Impairment Questionnaire."

The questionnaire is a five page form consisting of twelve questions, including a mix of check

boxes and fill-in-the-blank answers. Most significantly, Dr. Van Cleve indicated Stockdall's

functional limitations as "moderate" as to "restriction of activities of daily living;" and "marked"

as to "difficulties in maintaining social functioning" and "difficulties in maintaining

---

[7] "The BDI-II is a self-report measure examining symptoms of depression containing 21 questions, each answer being scored on a scale of 0 to 3," where scoring anywhere between 0 to 13 means the depression is minimal, 14 to 19 means the depression is mild, 20 to 28 means the depression is moderate, and scores of 29 to 63 equate with severe depression. Tr. at 364.
[8] The PCL-C "is a civilian self-report measure of Posttraumatic Stress Disorder (PTSD) symptoms," in which "possible scores range from 17 to 85" and "[a] score of 30 is suggested as the cutoff for diagnosis in a civilian primary care setting." Tr. at 364.

concentration, persistence or pace." Tr. at 402. "'Marked' means more than moderate but less

than extreme." *Id*. She further indicated that Stockdall has one or two "episodes of

decompensation within 12 month period, each of at least two weeks duration." Dr. Van Cleve

indicated, by checking a box, that Stockdall has "[a] residual disease process that has resulted in

such marginal adjustment that even a minimal increase in mental demands or change in the

environment would be predicted to cause the individual to decompensate." *Id*. When asked, "On

the average, how often do you anticipate that your patient's impairments or treatment would

cause your patient to be absent from work?" Dr. Van Cleve circled "About four days per month."

*Id*.

     In summary, there are sixteen medical records created by non-SSA providers, consisting

of thirty-seven pages. These records include two notes to Stockdall's file; nine records of visits

with Stockdall's treating psychiatrist; two records of counseling visits; two psychological

evaluations—one by Stockdall's counselor, and another by a third provider at Capstone; and the

Mental Impairment Questionnaire completed by Stockdalls' treating psychiatrist. These records

were created mostly in 2013 and 2014 and cover the timeframe between November 17, 2011,

and January 29, 2015.

## B. Hearing Before the ALJ

     Stockdall and a vocational expert (VE) testified at her hearing before the ALJ on

February 5, 2015. Stockdall appeared with her representative.

     Stockdall testified about her severe medical impairments. Concerning the anxiety and

depression, Stockdall stated that she has problems leaving her house, especially when someone is

not with her. Tr. at 45. She stated that she felt safe going to the store with her mom or children,

but has anxiety attacks that last thirty to forty-five minutes when she is out of the house. Tr. at 46.

Stockdall believes she has suffered from post-traumatic stress disorder since her ex-husband assaulted her during their marriage and tried to kill her. Tr. at 47. She described PTSD impacting her current life by causing unhappiness, and causing her to "go off" on people. Tr. at 48. It also causes her to be paranoid when people come close to her home. *Id.* Additionally, she discussed thoughts of wanting to hurt other people. Tr. at 49. At one point she testified that she did in fact hurt someone at a prior job and was fired as a result. Tr. at 43. She described that her mind races with thoughts of death. Tr. at 50-51. Stockdall testified that it helps relieve her distress when she cuts herself. Tr. at 51. Overall, Stockdall concluded that she distrusts people and feels insecure around them. Tr. at 52-53.

At one point leading up to her present application for SSI, Stockdall developed a belief that she has Asperger's, which she described as having poor social skills and inappropriate reactions when others are hurt. Tr. at 53. She has discussed this with her doctors who have encouraged her to continue treatment for depression.

When asked about doctor's notes describing variable or poor attention, Stockdall related that she quit school in the tenth grade because she couldn't stay focused. Tr. at 53-54. She further explained how her poor attention span carried over into present-day life at home, such as when she burns food she tries to bake, and begins housework she doesn't finish. Tr. at 54-55.

Stockdall was questioned about side-effects she feels from her medications. Tr. at 56. She complained that the Effexor makes her tired, and the Vyvanse might make her edgy. Tr. at 57. Stockdall claimed she told her doctor that she does not believe the Vyvanse is working. *Id.* She believes that the Effexor helps calm her down, for the most part. Tr. at 58.

The ALJ asked the VE about the availability of work for three hypothetical people. The first person is a younger individual with a GED education who has performed such jobs in the past as sales attendant, hand packager, and landscape specialist. This person is limited to tasks learned in 30 days or less, involving no more than simple work-related decisions, requiring little to no judgment, in a workplace where change is only occasional. This person has no interaction with the public and no more than occasional interaction with coworkers and supervisors.

When asked if this first hypothetical person can perform any work that has been performed in the last 15 years, the VE said, no. Tr. at 67. However, the VE testified that the person could perform jobs of document preparer, sorter, and addresser, all of which exist in large numbers in the national economy. Tr. at 67-68.

Next, the VE was questioned about a second hypothetical person, with the same limitations as the first, plus problems sustaining concentration and attention for two hours at a time throughout a normal workday. The VE testified that this person could not perform jobs in the regional or national economy. Tr. at 68.

And finally, the VE was questioned about a third hypothetical person, with the same limitations as the first, and who is absent from work three or more times a month. The VE testified that this person could not perform jobs in the regional or national economy. Tr. at 68-69.

**C. ALJ's Decision**

The ALJ's decision followed the five-step evaluation prescribed by Section 416.920 of Title 20 of the Code of Federal Regulations. This five-step sequence of evaluation includes consideration of: 1) whether the claimant is engaged in any substantial gainful activity; 2) the medical severity of claimant's impairments; 3) whether one or more of claimant's impairments meets an SSA listing and is of sufficient duration; 4) the claimant's RFC and past relevant work;

and 5) whether the claimant can "make an adjustment to other work." 20 C.F.R. §§ 416.920(a)(4)(i)-(iv).

At Step One, the ALJ found that Stockdall had not performed substantial gainful activity since June 17, 2013.

At Step Two, the ALJ found that Stockdall suffered from several severe impairments:[9] depression, anxiety with post-traumatic stress disorder features, borderline intellectual functioning, and personality disorder.

At Step Three, the ALJ found that Stockdall's severe impairments do not meet and are not the medical equivalent of a listing.

At Step Four, the ALJ found Stockdall unable to perform any past relevant work, but found she has the residual functional capacity to:

> perform a full range of work at all exertional levels but with the following nonexertional limitations: tasks that can be learned in 30 days or less, involving no more than simple, work-related decisions, requiring little to no judgement, and with only occasional workplace changes; no public interaction; and no more than occasional interaction with co-workers or supervisors.

Tr. at 21. The ALJ reached this conclusion without regard to the opinion of Stockdall's treating psychiatrist, finding "[Dr. Van Cleve's opinions] warrant no additional accommodations within the above-listed residual functional capacity assessment." Tr. at 25. The ALJ provides three reasons for this finding: 1) "Dr. Van Cleve submitted her opinion as responses to a form questionnaire;" 2) "Dr. Van Cleve's characterization of marked difficulties in social functioning and capacity for concentration, persistence, or pace is contrary to the claimant's demonstrated activities of daily living;" and 3) "[A]lthough the psychological and mental status testing

---

[9] A "severe impairment" is "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

performed by Dr. Van Cleve and her colleagues, Michelle Cushman, Ph.D., and Amanda

Johnson, Ph.D., yielded the results the claimant alludes to in her brief (i.e. difficulty getting

along with others, irritability and anger, racing thoughts, anxiety, and inadequate communication

skills), that brief fails to account for the extent of questionable validity among this testing." *Id.*

The ALJ began discussion of Stockdall's mental impairments by stating that "[t]he

claimant's activities of daily living also suggest her mental impairments are not as severe as

alleged," and without stating upon what other medical assessments she relies, finds: "like the

State agency psychological consultants, the undersigned finds the preponderance of the evidence

indicates the claimant remains capable of completing simple, repetitive tasks on a sustained basis

in a low stress environment that requires limited social interaction." Tr. at 25. In making this

finding, the ALJ referred to Tashner's March 2014 review, found within the agency's disability

determination on reconsideration. Tr. at 25, 100-01.

At Step Five, the ALJ found that Stockdall could perform jobs existing in significant

numbers in the national economy, considering: 1) Stockdall is a younger individual; 2) with at

least a high school education; 3) who is able to communicate in English; and 4) has a past

relevant work history of unskilled labor. Tr. at 26. Based on the foregoing, the ALJ issued the

decision that Stockdall has not been disabled since June 13, 2013, and denied her claim for

benefits. Tr. at 27.

## IV. STANDARD OF REVIEW

Final decisions of the Commissioner will be affirmed if they are "supported by

substantial evidence on the record as a whole." *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir.

2008). "Substantial evidence is less than a preponderance, but enough that a reasonable mind

might accept it as adequate to support a decision." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir.

2007). "Review under this standard is not a rubber stamp for the ALJ, however." *Griffon v. Bowen*, 856 F.2d 1150, 1153 (8th Cir. 1988) (citing *McMillan v. Schweiker*, 697 F.2d 215, 220 (8th Cir. 1983)). When reviewing the record, the Court will take into account evidence that detracts from the Commissioner's decision, but will not reverse unless the record cannot reasonably support the Commissioner's conclusion. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). "If substantial evidence supports the decision, we may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if we would have decided the case differently." *Davidson v. Astrue*, 578 F.3d 838, 841-42 (8th Cir. 2009) (citing *England v. Astrue*, 490 F.3d 1017, 1019 (8th Cir. 2007)).

## V. DISCUSSION AND ANALYSIS

Stockdall asserts that the ALJ's decision should be reversed because: 1) the ALJ erred by not giving controlling weight to Dr. Van Cleve's opinion; 2) the ALJ's Residual Functional Capacity Assessment is not supported by substantial medical evidence from a treating or examining source; and 3) the ALJ discounted subjective evidence without identifying inconsistencies in the record as a whole.

### A. Treating Physician

Stockdall argues that the ALJ violated the treating-physician rule by disregarding her treating psychiatrist's opinion. A treating physician's opinion is entitled to controlling weight if it is: 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques; and, 2) not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 416.927(c)(2). Treating physicians generally receive more weight "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot

be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id.* An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Anderson v. Astrue*, 696 F.3d 790, 793 (citing *Wildman* [sic] *v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007)). If an ALJ "does not give a treating source's opinion controlling weight," the following factors must be considered: 1) Examining relationship, 2) Treatment relationship, 3) Length of treatment relationship and the frequency of examination, 4) Nature and extent of the treatment relationship, 5) Supportability, 6) Consistency, and 7) Specialization, amongst other factors. 20 C.F.R. § 416.927(c)(1)-(6). "ALJs must articulate 'good reasons' for not giving the opinions of a treating physician controlling weight." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 286 (citing 20 C.F.R. § 404.1527(d)(2)).

The ALJ did not give Dr. Van Cleve's opinion controlling weight, nor did the ALJ weigh Dr. Van Cleve's opinion according to the factors set forth in the SSA's rules and regulations. While Dr. Van Cleve opined that Stockdall has "marked"[10] functional limitations in the area of "difficulties in maintaining social functioning," the ALJ found that Stockdall has only moderate difficulties. Tr. 19, 402. While Dr. Van Cleve opined that Stockdall has "marked" functional limitations in the area of "difficulties in maintaining concentration, persistence or pace," the ALJ found that Stockdall has only moderate difficulties. *Id.* Dr. Van Cleve's opinion is based on at least nine office visits for counseling and medication management of Stockdall during the timeframe relevant to Stockdall's application, as well as two psychological evaluations. The ALJ

---

[10] "Marked" means more than moderate but less than extreme." Tr. 402.

makes her findings without regard to the opinion of Dr. Van Cleve, Stockdall's treating psychiatrist, stating "they warrant no additional accommodations within the above-listed residual functional capacity assessment." Tr. at 25. Instead, the ALJ's opinion is based on Stockdall's "activities of daily living"[11] and "the State agency psychological consultants." *Id.*

The treating physician, Dr. Van Cleve's, opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. By the time Dr. Van Cleve completed the Mental Impairment Questionnaire on January 29, 2015, she treated Stockdall at least nine times between November 2012 and December 2014, seeing her every two to five months. During one of the longest durations between visits, Stockdall was referred for psychological evaluations at Capstone, from June through August of 2014. Although the record is limited to two years of psychiatric treatment notes, two medical records reflect that Dr. Van Cleve's treatment relationship with Stockdall began prior to 2012. The first record is a November 17, 2011, note by Dr. Van Cleve to Stockdall's chart indicating that Dr. Ruggle, another one of Stockdall's physicians, wrote a letter regarding ADHD medicine for Stockdall. Tr. 329. The second record is an October 11, 2012, "chart document" by Dr. Ruggle indicating that Dr. Van Cleve closed her Grinnell psychiatry office, but would continue to see Stockdall in Newton at Capstone. Tr. 281. The record also reflects that Stockdall's treatment relationship with Dr. Van Cleve did not likely end in December of 2014, as she was scheduled for a follow-up visit in 3-4 months. Tr. at 356.

In the June and August 2014 tests of Stockdall for differential diagnosis, Capstone used some of the same assessment procedures that were used during a prior disability application in 2010, such as the WAIS-IV and clinical interviews. The ALJ concluded that the 2014 tests were of "questionable validity," Tr. at 25, even though the evaluators concluded that, in spite of the

---

[11] Dr. Van Cleve opined that Stockdall has a moderate functional limitation in the area of "restriction of activities of daily living," Tr. 24, whereas the ALJ found that Stockdall has mild restriction. Tr. 402.

limitations noted, these assessments were valid conclusions and diagnostic assessments. Tr. at 362, 368. The ALJ relied on the earlier test results, as well as her opinion that Stockdall lacked credibility, to discredit Stockdall's claims as to her 2015 symptoms, even though "[a]n administrative law judge may not draw upon his own inferences from medical reports." *See, e.g., Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) (quoting *Lund v. Weinberger*, 490 F.2d 1187, 1189 (8th Cir. 1974) (citations omitted)). After the 2010 testing and diagnosis, Stockdall's psychiatric team continued to work toward more accurate diagnoses of Stockdall's conditions, through additional testing and medication adjustments. The Capstone medical records are the best detailed, longitudinal picture of Stockdall's mental impairments on the record, bringing a unique perspective that cannot be obtained from State agency consultative examinations alone. Substantial evidence on the record as a whole reflects that Dr. Van Cleve's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

Further, Dr. Van Cleve's opinion is not inconsistent with the other substantial evidence in the case record.  An ALJ may disregard the opinion of a treating physician, "where other medical assessments 'are supported by better or more thorough medical evidence,'" *Prosch v. Comm'r of Soc. Sec.,* 201 F.3d 1010, 1013 (quoting *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997)), and "where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Prosch*, 201 F.3d 1010 at 1013 (citing *Cruze v. Chater*, 85 F.3d 1320, 1324-25 (8th Cir. 1996)). Neither situation applies in this case.

There are no other medical assessments in the record providing better or more thorough medical evidence as to Stockdall's severe mental impairments. In fact, the only other assessment in the record dates back to 2010, and it does not account for, or rule out, all of Stockdall's severe mental impairments. Dr. Van Cleve's past records and opinions are not inconsistent to the extent

her credibility is undermined; her opinion was refined over the course of treating Stockdall, but she never rendered inconsistent opinions. Dr. Van Cleve's opinion, based on: 1) The January 29, 2015 form report, 2) her notes to Stockdall's chart, and 3) the 2014 psychological evaluations; is more reliable and should be given greater weight than: 1) The 2010 assessment by a State consultative examiner, 2) the November 2013 and March 2014 mental RFC assessments by non-examining State evaluators who relied on the 2010 evaluation and no subsequent tests or treatment, and 3) the ALJ's credibility finding regarding ADL based on 2015 testimony. The record does not reasonably support the ALJ's decision to disregard Dr. Van Cleve's opinion, and failure to weigh it, and doing so was clear error.

The ALJ did not articulate good reasons for not giving Dr. Van Cleve's opinion controlling weight. One of three reasons supporting the ALJ's decision to disregard Dr. Van Cleve's opinion lies in the fact that it was submitted as responses to a form questionnaire. Tr. at 25. Typically form reports are "weak evidence at best," and "their reliability is suspect." *Mason v. Shalala*, 994 F.2d 1058, 1065 (citations omitted); they are entitled to review as a part of the record as a whole. In *Mason*, the Court referred to a two-page form completed, without explanation, by a physician associated with a state agency. *Id*. By contrast, in this case Dr. Van Cleve served as Stockdall's treating psychiatrist for several years prior to the opinion which was summarized in the form report. Her responses are backed by treatment notes over a course of years, and her clinic's two psychological evaluations.

Instead of affording any weight to Dr. Van Cleve's opinion, the ALJ's decision relied upon Tashner's March 2014 assessment, a non-examining, non-physician reviewer for the SSA on reconsideration. Tashner's assessment is suspect in that it copies, verbatim, the 2013 assessment on initial review, with one additional paragraph that states, in part, "[c]laimant has

not sought any further treatment both mental or physically." Tr. at 101. A review of the record as a whole shows that this conclusion is not accurate. Between the time the SSA issued its initial decision in November 2013, and Tashner's statement in the SSA's decision on reconsideration in March 2014, Stockdall saw her treating psychiatrist, Dr. Van Cleve, on December 16, 2013, as part of her ongoing treatment, and medication management. Considering the substantial evidence on the record as a whole, the fact that Dr. Van Cleve, the treating psychiatrist, rendered an opinion in response to a form questionnaire without including a written narrative in the form, in addition to the opinions in her chart notes, is not grounds to disregard the treating physician's opinion where there is a substantial amount of other medical evidence on the record to support her opinion.

The ALJ's second and third reasons for not relying upon Dr. Van Cleve's opinion are based on her findings as to Stockdall's credibility and the "questionable validity" of Capstone's testing. While the ALJ provided three reasons for not giving Dr. Van Cleve's opinion controlling weight, the reasons are not considered good reasons under 20 C.F.R. § 416.927(c)(2). *See, e.g., Prosch v. Apfel*, 201 F.3d 1010, 1013-14 (holding the ALJ had good reason to grant less weight to the treating physician's opinion where the opinion was inconsistent with a past opinion issued by the same physician, and in conflict with the opinions of three other physicians); *and see Wagner v. Astrue*, 499 F.3d 842, 850 (holding the ALJ was entitled to discount the treating physician's opinion where it was inconsistent with a prior and subsequent opinion, and noting that the ALJ did not completely disregard the opinion).

The Court finds the ALJ erred by failing to give Stockdall's treating physician, Dr. Van Cleve's, opinion controlling weight and by failing to properly weigh the opinion, as required by 20 C.F.R. § 416.927(c)(2). This opinion was well-supported by medically acceptable clinical and

20

laboratory diagnostic techniques and was not inconsistent with the other substantial evidence in the case record. Further, Dr. Van Cleve's opinion and the medical evidence supporting it offers a unique, longitudinal perspective as to Stockdall's severe mental impairments. While an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions, in this case the ALJ's decision was not based on better or more thorough medical evidence, and Dr. Van Cleve's opinion is consistent with her past psychiatric treatment notes. The ALJ's decision to disregard the opinion of Stockdall's treating psychiatrist is not supported by valid reasons, or substantial evidence on the record.

## B. RFC Determination

Stockdall contends that the ALJ's RFC is flawed because it is not supported by substantial medical evidence from a treating or examining source. An RFC is based on all relevant evidence in the record, 20 C.F.R. § 416.945(a)(1), "including  the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Davidson v. Astrue*, 578 F.3d 838, 844 (quoting *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006)). RFC "is a medical question." *Nevland*, 204 F.3d at 858 (quoting *Ford v. Sec. of Health and Human Srvcs.*, 662 F. Supp. 954, 955 (W.D. Ark. 1987)). "[S]ome medical evidence must support the determination of the claimant's RFC." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (quoting *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010)). "The RFC must (1) give 'appropriate consideration to all of [the claimant's] impairments,' and (2) be based on competent medical evidence establishing the 'physical and mental activity that the claimant can perform in a work setting.'" *Partee v. Astrue,* 638 F.3d 860, 865 (8th Cir. 2011)

(quoting *Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996)). Evaluation of RFC in mental

disorders includes consideration of "limitations in understanding, remembering, and carrying out

instructions, and in responding appropriately to supervision, coworkers, and work pressures in a

work setting." 20 C.F.R. § 416.945(c).

At Step Two, the ALJ found that Stockdall's severe medical impairments are: depression,

anxiety with post-traumatic stress disorder features, borderline intellectual functioning, and

personality disorder. Tr. at 18. Despite finding these four mental impairments were severe, the

ALJ found Stockdall has the RFC to:

> perform a full range of work at all exertional levels but with the
> following nonexertional limitations: tasks that can be learned in 30
> days or less, involving no more than simple, work-related decisions,
> requiring little to no judgement, and with only occasional workplace
> changes; no public interaction; and no more than occasional
> interaction with co-workers or supervisors.

Admin. Tr. at 19-21. The ALJ found that Stockdall's ADL "suggest her mental impairments are

not as severe as alleged" and relies on a consultative examiner's 2010 opinion, relating to a past

application, to opine that Stockdall "possesses the cognitive abilities to work within a wide range

of simple, unskilled vocational situations" and "had fair social skills to handle interactions" with

others. Tr. at 24. Although acknowledging that Stockdall's "conditions could have deteriorated

since the issuance of [the 2010 assessment]," the ALJ found Stockdall's subjective complaints

lacked credibility. *Id*.

The ALJ's findings are inconsistent with several findings by Dr. Van Cleve, the treating

physician. Tr. at 402. The only substantial, objective medical evidence on the record relating to

Stockdall's *current* ability to function in spite of her severe mental impairments is the form

completed by Dr. Van Cleve, backed by her treatment notes and her team's psychological

evaluations. Not only had Stockdall's conditions deteriorated since the issuance of the 2010

assessment by a State agency consultative examiner, "a consulting physician's opinion is not considered substantial evidence, especially if contradicted by a treating physician." *Giles v. Barnhart*, 368 F. Supp. 2d 924, 942 (citing *Charles v. Barnhart*, 375 F.3d 777, 783 (8th Cir. 2004)).

As discussed, the ALJ improperly discounted and disregarded Dr. Van Cleve's medical opinion, and improperly drew her own inferences as to medical reports. Additionally, the ALJ's findings treat Stockdall's four severe mental impairments collectively, rather than considering them individually in light of how each impairment effects the mental activity Stockdall can perform in a work setting. As a result, the RFC is not based on all relevant medical evidence. It is undisputed that claimant's severe impairments prevent the performance of past relevant work. Tr. at 26. In determining whether the Commissioner met the burden of proving that the claimant retains the RFC to do other kinds of work, the Court examines the ALJ's findings and evidence relied upon.

The ALJ's finding as to Stockdall's RFC reflected the first hypothetical person posed by the ALJ to the VE during the administrative hearing. The ALJ's second hypothetical suggested that, in addition to the limitations described for hypothetical number one, the individual has trouble focusing and concentrating, to the point the person is unable to sustain concentration and attention through two hours at a time, through a normal workday. Tr. at 68. In the third hypothetical posed to the VE, the individual, in addition to the limitations described for hypothetical number one, was absent from work three or more times a month. *Id*. The VE testified that jobs exist for neither of the latter hypothetical persons. Tr. at 68, 69.

In the opinion of the treating physician, who should have been afforded controlling weight, Stockdall has poor attention to the extent that she is occasionally unable to maintain

attention for a two-hour segment. Tr. at 399, 401. According to the VE, a person with such limitations could not find other work. Tr. at 68. It is also Dr. Van Cleve's medical opinion that Stockdall is frequently unable to maintain regular attendance, adding that she anticipates Stockdall's impairments to cause her to be absent from work about four days per month. Tr. at 401, 403. Again, according to the VE, a person with such limitations could not find other work. Tr. at 69. With these limitations in mind, and no other objective medical evidence for the relevant time period, taking into consideration all relevant severe impairments on the record, the Commissioner fails to meet the necessary burden of proof. There is a lack of substantial evidence to support the Commissioner's decision that Stockdall retains the RFC to do other kinds of work.

### C. Credibility Determination

Stockdall also contends that the ALJ's RFC assessment is flawed because it discounts Stockdall's subjective allegations as to her ability to function, her memory, and symptoms, without identifying inconsistencies in the record as a whole. "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." *Polaski v. Heckler*, 739 F.2d 1320, 3122 (8th Cir. 1984). "The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians . . . ." *Id*. Other factors to be considered include:

> (i) [Claimant's] daily activities;
> (ii) The location, duration, frequency, and intensity of [claimant's] pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication [claimant] take[s] or ha[s] taken to alleviate [her] pain or other symptoms;

(v) Treatment, other than medication, [claimant] receive[s] or ha[s]
received for relief of [her] pain or other symptoms;
(vi) Any measures [claimant] use[s] or ha[s] used to relieve [her]
pain or other symptoms (e.g., lying flat on [her] back, standing for
15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning [claimant's] functional limitations
and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(i)-(vii). "Subjective complaints may be discounted if there are

inconsistencies in the evidence as a whole." *Polaski*, 739 F.2d at 3122.

After applying this test, the ALJ found that Stockdall's "symptoms are not entirely

credible," further finding that Stockdall's mental impairments are not severe enough to render

her disabled for the following reasons: 1) Stockdall's ADL suggest she can perform tasks

consistent with the performance of unskilled work; 2) in 2010 a consultative examiner opined

that Stockdall could "work within a wide range of simple, unskilled vocational situations" and

that Stockdall had "fair social skills to handle interactions" (this opinion was issued in

connection with one of Stockdall's past applications); 3) the record references symptom

exaggeration or questionable motives; and 4) Claimant has received sparse treatment for her

symptoms. Tr. at 24. These findings mischaracterize the record, depend upon the ALJ's

disregard of Stockdall's treating physician's opinion, which the Court has established was clear

legal error, and are not supported by substantial evidence on the record.

In this case there *is* an objective medical basis supporting the degree of severity of

Stockdall's subjective complaints, and Stockdall's work history is sporadic. *See Dix v. Sullivan*,

900 F.2d 135, 138 (8th Cir. 1990) (reversing decision denying benefits, holding, in part, that the

record established the claimant was not capable of holding a job for a significant period of time

despite occasional reprieves from symptoms). While Dix's claim for disability was based on

physical impairments, the fact that Stockdall's impairments are mental does not necessarily mean

that her symptoms are not severe enough to render her disabled. "Severe depression is not the blues. It is a mental illness; and health professionals, in particular psychiatrists, not lawyers or judges, are the experts on it." *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1997). While the ALJ must consider observations by examining physicians, the ALJ did not properly weigh the medical evidence, as Dr. Van Cleve, Stockdall's treating psychiatrist, is the expert on the effects of Stockdall's mental impairments on her ability to work.

The ALJ discredited Stockdall's subjective testimony of functional impairment based on her description of ADL. The ALJ pointed to evidence in the record where Stockdall is accused of malingering or exaggerating symptoms by the examiner in 2010,[12] by a physician she saw for treatment of fibromyalgia in 2014,[13] and by the licensed psychologists in Dr. Van Cleve's office in June, July, and August of 2014.[14] Tr. at 24-25. The ALJ also concluded that Stockdall failed to obtain treatment on a consistent basis, raising the suspicion that her symptoms are not as severe as alleged. Tr. at 24.

The ALJ erred in finding Stockdall's subjective complaints were inconsistent with the record as a whole. The ALJ inferred that Stockdall was malingering or exaggerating symptoms, based upon a treatment note relating to the timing of testing for fibromyalgia while this claim was pending. The ALJ inferred Dr. Cushman's evaluation was invalid, even though Dr. Cushman stated "[t]his evaluation is believed to be a valid assessment of [Stockdall's] abilities

---

[12] The ALJ referenced a comment in Dr. Martin's impressions and recommendations, stating "Overall, given her comments about 'pressing' for a favorable disability claim, and the suspected exaggeration of her symptoms, a diagnosis of malingering should also be given strong consideration." Tr. at 268. However, Dr. Martin also stated that, "[o]n interview, [Stockdall] appears a generally reliable informant." Tr. at 264.

[13] The ALJ referenced one sentence in the first paragraph of a medical record from Stockdall's visit to the Mercy Arthritis and Osteoporosis Center, which in full context, provides: "Today in clinic in regards to patient's primary concern on whether or not she has fibromyalgia she would seem to fit criteria having had pain per her history for greater than 6 months over multiple areas of her body without other clear etiology. The one caveat being per the notes it does appear she is in the process of applying for disability and that raises the question of possible secondary gain. She also appears to have done quite a bit of research online on this topic." Tr. at 340.

[14] As discussed, the ALJ improperly drew her own inferences from these psychological evaluations.

and current functioning." Tr. at 362. The ALJ inferred Dr. Johnson's evaluation was invalid, even though Dr. Johnson explained that she clarified Stockdall's unreliable test results during her clinical interview, finding Stockdall "in high distress," and "experiencing severe anxiety and depression." Tr. at 368-69. The ALJ inferred that Stockdall's symptoms were not as severe as alleged, based on Stockdall's failure to seek additional treatment. The record shows that Stockdall consistently followed Dr. Van Cleve's treatment plan, despite having trouble with payment for care and in spite of her transportation challenges to attend appointments. Tr. at 320-21, 323-24, 325-26, 327-28, 356-57, 360-61, 373-74, 375-76, 378-79.

In conclusion, the ALJ's adverse credibility finding is not supported by substantial evidence on the record as a whole. A substantial amount of relevant, objective medical evidence in the relevant timeframe validates Stockdall's subjective complaints. The ALJ also failed to give appropriate weight to the opinion by Stockdall's treating psychiatrist as to her ADL, precipitating and aggravating factors, effectiveness of medication, and functional restrictions. Because of these flaws in the ALJ's reasoning, her RFC assessment is not valid.

### VI. CONCLUSION

The ALJ did not give controlling weight to the opinion of the treating physician which was well-supported by medically acceptable clinical diagnostic techniques and consistent with substantial evidence on the record. The ALJ's RFC assessment failed to include all of Stockdall's functional limitations resulting from her severe medical impairments, as established by substantial medical evidence. The ALJ did not give full consideration to all of the evidence in the record as a whole relating to the subjective medical complaints. For these reasons the case should be remanded for further consideration.

## V. REPORT AND RECOMMENDATION AND ORDER

IT IS RESPECTFULLY RECOMMENDED that the Commissioner's decision denying Stockdall's application for SSI benefits be remanded for further consideration in light of this order.

IT IS ORDERED that the parties have until May 23, 2016, to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. 636(b)(1)(C). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990). Failure to timely file objections may constitute a waiver of plaintiff's right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985).

IT IS SO ORDERED.

Dated this 2nd day of May, 2016.


_____
Celeste F. Bremer
Chief United States Magistrate Judge